# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1980

_____

Michael D. Lundy,                              *
                                               *
        Plaintiff/Appellee,                  *
                                               *
Jayne Lundy,                                   *
                                               *
        Plaintiff,                           *
                                               *
S. Turner Allen; Sadie Lundy;                  *
Optimation, Inc.,                              *
                                               *
        Plaintiffs/Appellees,                *
                                               *  Appeal from the United States
    v.                                       *  District Court for the
                                               *  Western District of Missouri.
Guy M. Hilder; Susan Hilder,                   *
                                               *     [UNPUBLISHED]
        Defendants/Appellants,               *
                                               *
Optimation USA, Inc.,                          *
                                               *
        Defendant,                           *
                                               *
GMH Businesses, LC,                            *
                                               *
        Defendant/Appellant,                 *
                                               *
GMH Business Group; Robert                     *
Borchelt; Sheila Hill,                         *
                                               *
        Defendants.                          *

_____

Submitted: May 12, 2008
Filed: August 13, 2008
_____

Before WOLLMAN, MURPHY, and SMITH, Circuit Judges.
_____

PER CURIAM.

Guy Hilder ("Hilder"), Susan Hilder, and GMH Businesses, L.C. ("GMH") (collectively "the defendants"), appeal from the district court's[1] orders: (1) awarding plaintiff Optimation, Inc. ("Optimation") $2,071,989 on its breach of fiduciary duties claim against the defendants jointly and severally; (2) awarding plaintiff Michael Lundy ("Lundy") $139,776 on his guarantor subrogation claim against the defendants jointly and severally; (3) declaring void all purported actions undertaken by Hilder to effect the putative merger of Optimation and Optimation USA, Inc. ("OUSA"); (4) awarding Optimation a constructive trust over all Optimation and OUSA property; and (5) issuing an injunction against the defendants and their entities barring them from claiming or acting as if they have authority to act on behalf of Optimation, OUSA, or their assets.[2] We affirm.

## I. *Background*

Optimation was an Oklahoma certificated corporation operating as a software development and sales enterprise with all of its material business operations conducted in Missouri. Lundy was the President of Optimation, and Allen was Chairman of the

_____

[1]The Honorable Fernando J. Gaitan, Jr., Chief Judge, United States District Court for the Western District of Missouri.

[2]The district court also awarded nominal damages to the individual plaintiffs (Lundy, Jayne Lundy, S. Turner Allen, and Sadie Lundy) on their breach of fiduciary claims against Hilder. All other claims and counterclaims were dismissed by the district court.

Optimation Board of Directors ("BOD"). Collectively, Lundy and his family owned over 29% of Optimation's stock.

In January 2001, Optimation could not pay its obligations as they became due. To avoid filing for bankruptcy, members of Optimation's management, including Lundy and Allen, began negotiating with Mike McNeall and Dwight Huff to consummate a merger between Optimation and two other corporations, SimplyIP, Inc. ("SimplyIP") and Panorama!, Inc. ("Panorama"). The directors of the three companies began working on a written Principal Points Agreement ("PPA") whereby McNeall and Huff, with the help of outside investors, would infuse new capital and loans in excess of $4.4 million into the merged company, with the post-merger company keeping the Optimation name.

In March or April 2001, McNeall and Huff made contact with Hilder, who held himself out as an investor willing to make a capital investment in, and loans to, the post-merger Optimation in excess of $4.4 million. Hilder represented that he had more than $4.4 million of his own money that he would invest in the Optimation merger and that he would not be obtaining the money from any third party. Based on Hilder's representations, McNeall, Huff, and Hilder agreed that Hilder would act as CFO and CEO of Optimation and be paid $20,000 per month through Optimation. Hilder then became active in completing the PPA.

On or about May 3, 2001, the directors of Optimation, SimplyIP, and Panorama approved the written PPA for the intended merger. On May 16, 2001, based on the PPA and Hilder's representations as to investment funds, the BOD acted to facilitate a merger under the PPA by adopting a resolution appointing Hilder as Optimation's CEO and CFO, McNeall as Optimation's COO, and expressly retaining Lundy as Optimation's President until the merger was completed. This resolution was "made for the purpose of facilitating the promulgation of the merger as conceived in the Principal Points of Agreement," and the changes in management were "made with the

understanding that the promulgation of the merger will be enhanced, not hindered, by the advent of these management changes and the infusion of additional capital into Optimation, Inc."

Thereafter, Hilder assumed control of Optimation and directed that all incoming Optimation receipts be sent to his home in Austin, Texas. Hilder, with the assistance of his wife, Susan Hilder, began controlling Optimation's corporate finances from their home. On June 7, 2001, McNeall, Hilder, and Allen caused distribution of a package of proxy materials to Optimation shareholders. These "irrevocable proxies" stated:

> The undersigned hereby irrevocably appoints Mr. Guy M. Hilder (GMH) the Chief Executive Officer and Chief Financial Officer of Optimation . . . as the proxy of the undersigned and hereby grants to GMH this irrevocable proxy with respect to [the undersigned's shares of stock], with all power and authority to vote and to execute and deliver written consents, in each case, in the name, place and stead of the undersigned, at any annual or special meeting of stockholders of the Company, . . . or as to any action that can be taken by written consent, in favor of (i) the matters described on Exhibit A hereto (collectively, the Matters), (ii) any other transaction or matters contemplated by the Matters, and (iii) any actions required in furtherance of any of the foregoing, in such manner as GMH may determine in its reasonable discretion, in each case to the same extent and with the same effect as the undersigned might or could do under any applicable law or regulation governing the rights and powers of stockholders of an Oklahoma corporation, irrespective of whether the undersigned is present at such meeting.

> This Irrevocable Proxy constitutes a valid and effective irrevocable proxy . . . . This Irrevocable Proxy shall remain in full force and effect until the merger is finalized in accordance with the guidelines set forth in the Principle Points of Agreement regarding the merger of Optimation and SimplyIP.

Further, attached to each proxy was an "Exhibit A," which explained the authority conveyed to Hilder to vote for: (1) "the acceptance of the final Merger Agreement . . . detailing and following the guidelines set forth in the Principal Points of Agreement"; (2) "the election of a new Board of Directors for Optimation, Inc. as part of the final merger of Optimation and SimplyIP"; (3) "the new Articles of Incorporation for Optimation, Inc. . . . as part of the final merger of Optimation and SimplyIP detailing and following the guidelines set forth in the Principal Points of Agreement"; and (4) "the new Bylaws of the Corporation for Optimation, Inc., . . . as part of the final merger of Optimation and SimplyIP detailing and following the guidelines set forth in the Principal Points of Agreement."

Based on these disclosures, Hilder obtained the shareholder proxies from most of Optimation's shareholders. The proxies did not provide for any waiver of: (1) the certificate of incorporation provisions for calling meetings; (2) the shareholder right to receive a notice of the special shareholders' meetings at which the proxy would be voted; or (3) the certificate of incorporation provision stating that no action to be taken in a shareholder meeting could be taken by unanimous consent in lieu thereof.

On June 28, 2001, no final merger agreement had been reached between Optimation, SimplyIP and Panorama. Nevertheless, Hilder purported to use the proxies to call an Optimation special shareholders' meeting to: (1) approve the Optimation-SimplyIP-Panorama merger; (2) elect a new board of directors; and (3) adopt new articles of incorporation and bylaws for the merged company. Moreover, Article 15 § 2 of the Optimation Restated Certificate of Incorporation effective on that date provided that only the Chairman of the Optimation BOD, President of Optimation, or the Optimation BOD by resolution had the authority to call a shareholders' meeting. Yet on June 28, 2001, Hilder did not hold any of those positions.

On and after June 28, 2001, Hilder claimed to take certain written shareholder actions on the authority of the shareholder proxies without notice of or holding a shareholder meeting. On June 28, 2001, and July 1, 2001, Hilder, McNeall, and Huff acted as directors of Optimation and, among other actions, involuntarily "retired" Lundy, Sadie Lundy, and Allen as employees of Optimation.

After learning of Hilder's purported actions under the alleged authority of the proxies, Lundy and others questioned the lawfulness of Hilder's June 28th actions. On July 20, 2001, Optimation's corporate counsel sent Hilder a memo advising that Hilder lacked the power to use the shareholder proxies for his purported actions. Hilder responded by again promising to make an investment of $5 million and to complete the merger in line with the PPA. In an attempt to make his previous actions lawful, Hilder then asked the members of the BOD (including Lundy and Allen) to resign from the BOD and elect McNeall, Huff, and Hilder as replacement directors, effective retroactively to June 28, 2001. On July 24, 2001, based on Hilder's representations of his intent to follow the PPA and provide the new capital and loans, the BOD resigned and elected Hilder, Huff, and McNeall as the new BOD, with Hilder as Chairman of the BOD. These elections were made retroactive to June 28, 2001.

On September 17, 2001, Hilder prepared two Optimation resolutions, titled "Corporate Sales Agreement" and "Corporate Closure Agreement." Hilder told McNeall and Huff that he was prepared to fund the promised investment in the Optimation merger and that he needed them to sign the two resolutions; McNeall and Huff did so. The Corporate Sales Agreement stated that Optimation was selling all of its assets to OUSA, a Texas corporation formed and owned by the Hilders. Hilder did not give Optimation's shareholders any notice of this purported sale. Without giving

any consideration, Hilder and Susan Hilder, as owners of OUSA, obtained a 62% ownership interest in Optimation's assets.[3]

By September 25, 2001, the plaintiffs had sent their first demand letter to Hilder, demanding a shareholder meeting and proof of Hilder's compliance with the PPA. Hilder never called such a meeting. On October 7, 2001, Hilder, on his own, purported to vote the proxies to remove McNeall and Huff from the BOD and from their respective duties as COO and Senior Vice President of Operations. At the time of these purported actions, Optimation's articles of incorporation and bylaws provided that directors could only be removed "for cause" by two-thirds vote of the shareholders. Further, the certificate of incorporation defined "for cause" as the "commission of a felony or a finding of a court of competent jurisdiction of liability for negligence or misconduct in the performance of Director's duties to the Corporation in a matter of substantial importance, where such adjudication is no longer subject to direct appeal." Hilder alleged no "for cause" events justifying his purported removal of McNeall and Huff.

On October 25, 2001, Hilder sent a letter to Optimation shareholders announcing that he had cancelled the Optimation-SimplyIP-Panorama merger and removed McNeall and Huff as officers and directors of Optimation. Denying that they had been validly removed from the BOD, McNeall and Huff noticed and called an October 31, 2001 meeting of the BOD; at this BOD meeting, McNeall and Huff, as the majority of the BOD, voted to remove Hilder and Susan Hilder from all offices of Optimation.

Nonetheless, in a November 7, 2001, letter to shareholders, Hilder announced that the BOD had exercised voting power to sell all of Optimation's assets to OUSA,

---

[3]Although the Corporate Sales Agreement was signed on September 17, 2001, the articles of incorporation for OUSA were not filed with the state of Texas until October 8, 2001.

a subsidiary of GMH businesses. On February 28, 2002, the plaintiffs filed suit against the Hilders, OUSA, and GMH for, among other things, breach of fiduciary duties and diversion of corporate assets. The plaintiffs alleged that the Hilders' unlawful actions caused them individual losses as creditors, former employees, former ERISA fiduciaries, and shareholders of Optimation. Optimation brought a direct action against the defendants to redress injuries to the corporation, its creditors, and its shareholders.

Despite the lawsuit, Hilder continued to hold himself out as President and CEO of Optimation. In September 2002 Hilder informed the district court that he would call an annual Optimation shareholder's meeting in November 2002 "for the purpose of electing the Board of Directors for the company." On October 11, 2002, Susan Hilder, claiming to be the Secretary of Optimation, sent out a notice of special shareholder's meeting, but the notice did not provide for the election of BOD, it proposed to ask the shareholders to approve the purported September 28, 2001, merger between Optimation and OUSA. On the night of the proposed meeting, however, Hilder posted a sign at Optimation's offices cancelling the meeting. On October 29, 2002, Susan Hilder sent out a notice of shareholders meeting for November 13, 2002. But again, the meeting was cancelled when Susan sent a "notice of deferral" to the shareholders. Then, on November 7, 2002, Hilder filed a document purporting to give notice of a merger of Optimation and OUSA with the Oklahoma Secretary of State. Susan Hilder rescheduled the special shareholder's meeting for November 18, 2002, in Austin, Texas—not the Optimation offices in Missouri—with the notice stating that the shareholders would be asked to approve the Optimation-OUSA merger.

Huff and McNeall, as directors of Optimation, as well as Lundy and other shareholders continued to try to oust the Hilders from Optimation, but the Hilders continued to operate and control Optimation and all of its revenues through the trial. The Hilders—Susan Hilder was Optimation's secretary and bookkeeper—did not pay

employment taxes for Optimation, even though they continued to issue $20,000 monthly salary checks to Hilder.

On October 28, 2003, Hilder put OUSA into a Chapter 7 bankruptcy. Once notified of the bankruptcy, the district court stayed this lawsuit. On June 24, 2004, the bankruptcy court granted the plaintiffs' motion for relief from the automatic stay to allow them to pursue this lawsuit. In doing so, the bankruptcy court found that the sole reason for OUSA's bankruptcy was to delay this litigation. After several more delays and continuances—mostly to allow the defendants to obtain new counsel after their prior counsel was allowed to withdraw from the case just before the trial date scheduled in late 2004—this case finally went to trial in late August 2005.

After a two-day bench trial, the district court ruled that the irrevocable proxies were only valid until the Optimation-SimplyIP-Panorama merger was finalized. Once Hilder announced on October 25, 2001 that he had cancelled the merger, the proxies became invalid, and thus Hilder lacked authority to use the proxies after that date. Further, the district court found that: (1) Hilder did not have the $4.4 million in 2001 as he had represented; (2) the $4.4 million in promised investments and loans was never made; (3) the "Corporate Sales Agreement" between Optimation and OUSA was contrary to the PPA and void because OUSA had not even been formed yet; and (4) Hilder's testimony was not credible regarding his claim that the Optimation-OUSA merger was an innocent ministerial step toward the Optimation-SimplyIP-Panorama merger.

The district court ruled in favor of the individual plaintiffs, as proxy givers, against Hilder as proxyholder, on their claim for avoidance of all purported transactions involving Optimation's assets and stock, including the alleged merger. In reaching this decision, the district court found that Hilder, as a proxyholder, was a fiduciary to the plaintiffs and that he failed to meet his burden of demonstrating the authority and intrinsic fairness of the transactions between Optimation and OUSA. As

a result, the court declared that the purported written consents prepared by Hilder for shareholder actions and all other actions taken by Hilder to effect a merger or transfer of assets or rights in Optimation assets or stocks to be void *ab initio* for lack of authority under the proxies. The court also declared all subsidiary or derivative agreements or actions taken by the Hilders in the name of Optimation to be void *ab initio*.

The court also ruled in favor of Lundy on his claim for guarantor subrogation against Hilder, Susan Hilder, OUSA and GMH. The court found that Lundy had purchased all of the rights of UMB Bank as a secured creditor of Optimation and that the defendants since September 2001 had exercised dominion and control over the Optimation assets, which was the collateral securing Optimation's obligation to UMB Bank, such that the defendants interfered with the rights of a secured creditor in the collateral to which Lundy was subrogated and assigned. The court found that Lundy was entitled to a judgment for damages against the defendants for the accounts receivable that they collected after UMB Bank's January 2002 default declaration.

The district court also ruled in favor of Optimation its breach of fiduciary duties claim. In reaching this conclusion, the district court found that Hilder's representations as to his intent to invest over $4.4 million in Optimation and having funds ready to do so were false when made, were made with the intent to manipulate the existing BOD into resigning so that Hilder could take control of the corporation, and that the BOD relied upon those representations in resigning. The district court found that Hilder, as an officer and director of Optimation, and as an officer and director of OUSA (which Hilder claimed was the merged successor of Optimation), was a fiduciary to Optimation, and that Susan Hilder, as an officer and director of OUSA, was a person aiding and abetting Hilder's breach of fiduciary duties. The district court concluded that the Hilders failed to meet their burden of demonstrating their authority and the intrinsic fairness of their purported transactions between Optimation and OUSA.

Further, the court found that Hilder had no authority to remove Huff and McNeall as Optimation directors and that every action purportedly taken by the Hilders in the name of, for, or on behalf of Optimation after October 31, 2001—the date that Huff and McNeall acted as the BOD to remove the Hilders as officers, employees, and agents of Optimation—were unauthorized and therefore void.

Because the Hilders refused to respond to the plaintiffs' discovery requests and did not provide financial and other information about Optimation and its corporate affairs, the district court ruled that Optimation and Lundy were entitled to an accounting from the Hilders as to the disposition of all Optimation revenues from and after September 17, 2001, before the amount of damages could be determined and assessed. The district court also awarded Optimation a constructive trust over all Optimation and OUSA property and entered an injunction against Hilder, Susan Hilder, and their entities, barring them from claiming or acting as if they have authority to act on behalf of Optimation, OUSA, or their assets. The court also ruled that the Hilders defended the action in bad faith using sham defenses intended to delay.

The district court later ordered the Hilders, through their counsel, to make immediate contact with plaintiffs' counsel, identify any assets purchased with Optimation proceeds or revenue, and arrange for the plaintiffs to take dominion, control, and possession of all assets of Optimation.

On April 26, 2006, the district court appointed a special master to resolve all disputes as to: (1) the accounting as referenced in the district court's order; (2) discovery regarding disgorgement damages; (3) the injunctive relief granted by the court; (4) the transfers of assets referenced in the order; and (5) any other issues that may arise related to the court's April 7, 2006 order. The parties, under the special master's supervision, began discovery on the accounting and bank records. The special master held two sessions to address discovery and take evidence. The special master

found that the plaintiffs had made several attempts to obtain copies of the Hilders' financial records but that the Hilders had refused to provide them. The Hilders only provided a Quickbooks report for Optimation from October 2001 to October 2003 and a one-page "accounting" that was prepared by one of their accountants who had a role in overseeing the Quickbooks that the Hilders used for certain periods after September 2001. The one-page accounting, however, was not signed and did not state the period of time it covered. Moreover, the accountant refused a deposition, and the Hilders claimed that they could not secure the accountant's attendance for one. The special master directed the Hilders and the accountant to appear for depositions, and the plaintiffs agreed to conduct the depositions in Austin, Texas, but a few days before the scheduled depositions the Hilders' counsel announced that neither the Hilders nor the accountant would appear.[4]

The special master found that the Hilders "thwarted and refused discovery and access to information about their disposition of monies and other assets" post-trial. The special master held a "mini-trial" to establish the damages, but the Hilders only appeared through counsel. At this mini-trial, the plaintiffs submitted an exhibit prepared by Lundy, summarizing, by year, the revenues that the Hilders had derived from Optimation assets and the amounts of money that the Hilders had withdrawn from those revenues. Lundy prepared the summary after examining: (1) the Quickbooks report provided by the Hilders from October 2001 through October 2003; (2) statements and cancelled checks from bank account that the Hilders maintained with Compass Bank (which the plaintiffs obtained through subpoena); and (3) invoicing, cancelled checks, and other information obtained from Optimation/OUSA

---

[4]In a related case, the IRS sued the Hilders in the United States District Court for the Western District of Texas for failing to pay employment taxes while in control of Optimation and sued Optimation for the employment taxes that the Hilders failed to pay. The plaintiffs' counsel attended a deposition of the Hilders in that case, but when he sought to question the Hilders on matters related to the present case, the Hilders, on advice of counsel, refused to answer the questions.

customers. The summary that Lundy presented was admitted into evidence. The defendants' counsel did not cross-examine Lundy about the numbers he came up with, nor did the defendants otherwise contest these numbers at the mini-trial. The defendants also did not present any admissible evidence of their own as to revenues received or expenses incurred by the Hilders in relation to Optimation's activities. Based on the only evidence before him—Lundy's summary—the Special Master recommended awarding Lundy $7.3 million on his guarantor subrogation claim based on the defendants' tortious diversion of accounts receivable proceeds and recommended that Optimation be awarded disgorgement against the defendants in the amount of $7.7 million.

The district court affirmed in part the special master's report, but reduced the amounts awarded. The district court awarded judgment to Lundy in the amount of $139,776—which was the total amount owed to him under the note—plus interest, attorney's fees, and costs. With respect to the disgorgement award to Optimation, the court noted that the defendants were given opportunities to demonstrate the fairness of the transactions they engaged in, but they refused to do so, leaving the court with only the amounts of revenues and net withdrawals in evidence. Nonetheless, the district court reduced the disgorgement damages recommended by the special master to $2,071,898—which was the amount of net withdrawals by the Hilders from 2001–2006. The court determined that disgorgement of all of the revenues during the time span would have been inappropriate because Optimation was insolvent in 2001. The court made both of these judgments against the defendants joint and several. In all other material respects, the district court adopted the Special Master's report in full.

## II. *Discussion*

The Hilders now appeal, arguing that: (1) Hilder had authority to effect the Optimation and OUSA merger; (2) the court was incorrect in finding that the Hilders profited as a result of their actions; (3) the court erred in ruling that Susan Hilder aided

and abetted Hilder in breaching his fiduciary duties; and (4) the court erred in finding defendants liable to Lundy for damages for accounts receivable.

> In [an] appeal from a civil bench trial, we review the trial court's findings of fact for clear error. Its conclusions of law are subject to de novo review. Mixed questions of law and fact that require the consideration of legal concepts and the exercise of judgment about the values underlying legal principles are also reviewed de novo.

*Cooper Tire & Rubber Co. v. St. Paul Fire & Marine Ins. Co.,* 48 F.3d 365, 369 (8th Cir. 1995).

Having carefully reviewed the record and considered the parties' briefs under this standard, we find no error in the district court's disposition of the case. We therefore affirm for the reasons stated by the district court in its thorough and well-reasoned orders. *See* 8th Cir. Rule 47(b).

_____